IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-00873-DME-CBS

COBRA NORTH AMERICA, LLC, a Colorado Limited Liability Company,
d/b/a Pyrolance North America,

      Plaintiff,

v.

COLD CUT SYSTEMS SVENSKA AB, a Swedish company,

      Defendant.

---

## ORDER

---

This matter comes before the court on the motions of Plaintiff Cobra North America, LLC, doing business as Pyrolance North America ("Pyrolance") for a stay of arbitration proceedings, occurring in Sweden between Defendant Cold Cut Systems Svenska AB ("CCS") and American Cobra AB, and for a preliminary injunction, and Defendant CCS's motions for a stay of this litigation pending that Swedish arbitration, and for a preliminary injunction. (Docs. 9, 16, 49.) After conducting an evidentiary hearing and considering the parties' evidence and argument in support of these motions, the Court makes the following determinations:

## I. FACTUAL FINDINGS[1]

---

[1]These factual findings are based upon the evidence the parties presented at a hearing held August 22, 2008, addressing the parties' motions for

(continued...)

1

**A.    CCS developed the Cobra**

Defendant CCS is a Swedish company.  CCS spent approximately three million U.S. dollars and five years, from 1995 through 2000, developing the Cobra, a rifle-like fire fighting device that is able to cut holes into a burning structure using a mixture of water and aggregate.  This device allows fire fighters to reduce the heat and intensity of a fire in a safer manner than the methods fire fighters previously employed.  CCS patented the Cobra in several countries, including the United States.

In an effort to market and sell the Cobra world wide, CCS has developed an international network of approximately eighteen exclusive distributorships.  Using this network, CCS has sold 300 Cobras in twenty-eight to thirty different countries.

**B.    CCS's licensing agreement with ACAB**

In September 2006, CCS entered into a Licensing Agreement with a Swedish company formed by Kevin Spencer, American Cobra AB, later known

---

[1](...continued)
preliminary injunctive relief and their respective stay motions.  Because that hearing addressed requests for preliminary injunctions, the Federal Rules of Evidence did not apply.  See Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).  These factual findings are, of course, preliminary and do not bind the Court in the ultimate resolution of Plaintiff's claims.  See id.

After the evidentiary hearing, Pyrolance filed an "Offer of Proof and Motion to Submit Additional Evidence in Support of Motion for Preliminary Injunction."  (Doc. 68.)  That motion is DENIED.  CCS's motion seeking attorney's fees and costs is also DENIED.  (Doc. 69.)  So, too, is Pyrolance's "Motion for Leave to Submit, in Further Support of Pyrolance['s] Motion for Preliminary Injunction, Expert Opinion of Professor Bengt Domeij."  (Doc. 71.)

as Pyrolance AB ("ACAB" or "Pyrolance AB").  According to Spencer, the hope of the parties in negotiating this Licensing Agreement was to manufacture the Cobra in the United States.  Spencer and CCS's then managing director, Johan Patyranie, also discussed the possibility, "over time," of manufacturing the Cobra in other areas of the world.  (Tr. at 27.)

The CCS/ACAB Licensing Agreement differed markedly from the exclusive distributorship agreements CCS had with its distributors.  Through the Licensing Agreement, CCS granted ACAB an exclusive license to use CCS's U.S. Patent, as well as its "know-how," trademarks and copyrighted materials, to manufacture, market and sell the Cobra in the United States and Canada.  In return, ACAB agreed to pay CCS an "advanced sales royalty" of $1 million (U.S.), paid in three installments over an eighteen-month period.  In addition, ACAB agreed to pay CCS a $7,000 (U.S.) royalty for each Cobra sold, which would initially be set off against the advanced sales royalty.

The CCS/ACAB Licensing Agreement was governed by Swedish law. Further, CCS and ACAB agreed to arbitrate "[a]ny dispute, controversy or claim arising out of, or in connection with [that] Agreement."  (Lic. agreement § 19.)

C.    **ACAB's sublicensing agreement with Pyrolance**

In October 2006, ACAB entered into a Sublicensing Agreement with a Colorado company created by Kevin Spencer, Plaintiff Cobra North America, LLC, doing business as Pyrolance North America ("CNA" or "Pyrolance").[2]  The

---

[2]In his initial April 2006 business plan, Spencer explained the reasons for
(continued...)

CCS/ACAB Licensing Agreement had expressly provided that ACAB could sublicense the license ACAB had received from CCS. The terms of the ACAB/Pyrolance Sublicensing Agreement were essentially identical to the CCS/ACAB Licensing Agreement.

## D. Pyrolance's efforts to manufacture the Cobra

After entering into the ACAB/Pyrolance Sublicensing Agreement, Pyrolance began efforts to locate a manufacturer in the United States with which Pyrolance could partner to manufacture the Cobra. According to Kevin Spencer, the parties initially envisioned "an assembly-type process." (Tr. at 25.) But in December 2006, Pyrolance instead entered into a contract with Fluid Power Products ("FPP"), a Florida company, to manufacture, and not merely to assemble, the Cobra. In its manufacturing efforts, FPP made several

---

[2](...continued)
this license/sublicense arrangement:

> One suggestion of merit would be to form a Swedish company and a U.S. company. The Swedish company would hold the exclusive license. The U.S. company would be a wholly owned subsidiary of the Swedish company and would execute the business plan in the U.S. and Canada. The logic behind this structure is two fold. The first one being to protect the license from any litigation against the U.S. company by holding the license within the Swedish entity. Any litigation or damaging effects upon the U.S. company could be mitigated by simply forming a new U.S. corporation, having the license fully protected, and apart from any U.S. litigation. The second benefit to this structure would be that both companies (CCS and the newly formed Swedish Company) could settle any disputes by Swedish arbitration. This method would be cost effective and efficient. The ownership structure of both companies would be identical.

(Ex. D-4 at 1-2.)

modifications to the Cobra.  Pyrolance refers to its modified Cobra as the Pyrolance®.

**E.    CCS terminates the CCS/ACAB Licensing Agreement**

One of the stated purposes of the CCS/ACAB Licensing Agreement was for ACAB "to obtain from CCS technology and technical assistance as well as copyright, trademark and patent licenses for the purpose of manufacturing, producing and selling such system as the exclusive licensee within the agreed territory."  (Lic. agreement at 3.)  The ACAB/Pyrolance Sublicensing Agreement echoed this purpose.  These agreements each defined "the territory" to "mean USA, Canada, and each and all of their respective territories and possessions existing at any time during the Term" of the License and Sublicense.  (Lic., sublic. agreements § 2.17.)

In July 2007, Pyrolance sold a cobra-like device to a buyer in Qatar.  CCS deemed this sale, outside the territory set forth in the Licensing Agreement, to be a material breach by ACAB of that agreement.  The Licensing Agreement provided:

> Should either party commit a substantial breach of this Agreement, then the other party shall, in addition to any other remedies that it may have, have the right to give the first-mentioned party a six months' notice of termination specifying any alleged breach, and then to give such party a notice of termination with immediate effect in the event any breach so specified has not been remedied during such time period.

(Lic. agreement § 14.2.)

In light of this provision, CCS sent ACAB a letter, dated August 7, 2007, stating that, "according to the [CCS/ACAB Licensing] Agreement Pyrolance AB

has been granted a license limited to a Territory being defined as the USA and Canada." (Ex. D-29.) CCS further informed ACAB that CCS considered Pyrolance's Qatar sale to be "a substantial breach of the [Licensing] Agreement by Pyrolance AB. . . ." (Id.) In addition, CCS informed ACAB that its breach,

> unless rectified, will give CCS the right to terminate the Agreement according to its terms. CCS reserve[s] the right to effect such termination should the breach not be fully rectified. CCS also reserves the right to take appropriate action against any third party infringing its intellectual property or know-how. Further, CCS requests that Pyrolance AB, regarding the sale to Qatar as well as other inquiries from customers or potential customers outside the Territory, refers the customers or potential customers to CCS.

(Id.) The letter also explained that "[a]s Pyrolance AB is no doubt aware, such termination would automatically also terminate the sub-licensing agreement between Pyrolance AB and CNA." (Id.) CCS did not receive any communication from ACAB in response to this notice of breach. Therefore, CCS again complained to ACAB, in November 2006, about the Qatar sale.

The following month, on December 21, 2007, CCS sent Spencer an email complaining this time that CCS's Taiwan agent had notified CCS "that a company representing Pyrolance has offered a 'Cobra product'" to a Taiwanese entity. (Ex. P-14, D-37.) In that email, CCS's directing manager, Patyranie, stated that, "[i]n view of our license agreement I sincerely hope that you can confirm to me that Pyrolance neither directly or through any other party has offered 'Cutting Extinguishing' – Pyrolance Equipment – to Taiwan or elsewhere outside your territory." (Id.) CCS's Patyranie concluded by stating that "it is important for me and my board to know if Pyrolance is trying to sell in Taiwan or

elsewhere outside your territory."  (Id.)

In January 2008, and again in February 2008, CCS discovered that Pyrolance was engaged in further marketing and sales activities in the Middle East, including in Iran and the United Arab Emirates.  Pyrolance also attempted to make a sale in Latvia.  In a March 4, 2008 letter, CCS again objected to ACAB about international sales and marketing efforts.

The CCS/ACAB Licensing Agreement required ACAB to make one of its three "Advanced Sales Royalty" installments, a $250,000 payment to CCS by March 18, 2008.  (Lic. agreement § 14.2.)  The question of whether ACAB intended to make that payment was the subject of several letters, beginning in August 2007.  For instance, in January 2008, Pyrolance suggested to CCS that, in light of the expenses Pyrolance had incurred in attempts to rectify what Pyrolance deemed to be existing defects in the Cobra, a "suitable means of resolution" of this dispute might be "to place the [upcoming] royalty payment into the custody of a neutral third party arbitrator, who would then be requested under the Agreement to make a binding determination as to what amounts, if any, CCS remains legally entitled to."  (Ex. P-15.)  On March 4, 2008, however, CCS's attorney responded to ACAB's attorney, stating that "Pyrolance's attempt to evade its contractual obligation to pay the next Advance Sales Royalty of USD 250,000 to CCS by instead placing the payment in some sort of custody as proposed by Mr. Spencer in his letter to CCS is not appreciated.  CCS does not accept this proposal."  (Ex. D-45.)  CCS instead "again requested" that Pyrolance AB "make the payment of USD 250,000 in cash to CCS's account . .

. no later than 18 March 2008 in accordance with the agreement." (Id.)

Arne Hall, the Chairman of ACAB sent CCS a $250,000 check from CNA, dated March 10, 2008 and signed by Mr. Spencer, although he did so "under protest." (Ex. D-46.)  Along with that payment, ACAB assured CCS that "Pyrolance has not engaged, and does not intend to engage, in any marketing, manufacture, or sale of the Pyrolance in any territory where such conduct would be a violation of the Agreement or CCS' patent rights." (Id.)  CCS received CNA's $250,000 check on March 14, 2008.  Although the parties dispute when these funds were actually transferred from Spencer's bank to CCS's account, CCS did eventually receive this payment.

On April 14, 2008, CCS notified ACAB that it was terminating its Licensing Agreement with ACAB, "effective immediately." (Ex. D-47.)  Among the several reasons CCS gave to justify the termination, CCS stated that

> [ACAB] has repeatedly engaged in marketing and sales activities outside the agreed territory USA and Canada.  This behavior on the part of [ACAB] has continued also after [ACAB] was notified of its breach by letter 7 August 2007.  It constitutes a material breach of the Agreement entitling CCS to terminate the same with immediate effect.

(Id.)  CCS further informed ACAB that,

> [a]s a consequence of this termination all rights granted to [ACAB] under the Agreement [must] cease forthwith. [ACAB] is consequently no longer entitled to, among other things, manufacture, market, distribute or sell the licensed product.  Furthermore, [ACAB] is requested to immediately cease using CCS's know-how received under the Agreement and to promptly return to CCS all documents (including copies) received.

(Id.)

**F.    Post-termination**

A few days after terminating the CCS/ACAB Licensing Agreement, CCS, on April 18, 2008, sent a letter to Pyrolance's manufacturer, FPP, notifying FPP that CCS had "terminated [CCS's] license agreement with" ACAB and that "[t]he termination entails the automatic, termination of Pyrolance LLC's sublicense to use CCS's rights to manufacture, market and sell the Product." (Ex. P-19, D-48.) CCS further informed FPP that,

> [b]y reason of the above we hereby inform you that any manufacturing of the Product or other use of CCS's above rights, including the captioned patent [CCS's U.S. Patent], must be suspended with immediate effect. Absent such a suspension, CCS reserves all of its rights including (without limitation) the right to initiate legal action for infringement.
>
> Please note that, without prejudice to the above, CCS may be willing to discuss a potential future roll [sic] for FPP in relation to the Product. Should you be interested in such a discussion, or should you otherwise have any questions regarding the above, we kindly ask you to contact the undersigned.

(Id.)

On April 28, 2008, two weeks after CCS terminated the CCS/ACAB Licensing Agreement, Pyrolance initiated this litigation. On April 30, CCS initiated arbitration proceedings in Sweden against ACAB.

## II. ANALYSIS

**A.    CCS's motion to stay this litigation**

Initially CCS sought an order compelling Pyrolance to arbitrate its claims against CCS in Sweden, pursuant to the arbitration clause in the CCS/ACAB Licensing Agreement. See 9 U.S.C. § 206 (providing that "[a] court having

jurisdiction under this chapter [of the Federal Arbitration Act ("FAA")] may direct

that arbitration be held in accordance with the agreement at any place therein

provided for, whether that place is within or without the United States").  Along

with that motion to compel arbitration in Sweden, CCS also requested under the

FAA that this court stay this litigation pending such arbitration.  See Salim

Oleochemicals v. M/V SHROPSHIRE, 278 F.3d 90, 90-91, 93 (2d Cir. 2002)

(applying 9 U.S.C. § 3 to action seeking arbitration in London)[3]; Delta Computer

Corp. v. Samsung Semiconductor & Telecomm. Co., 879 F.2d 662, 663 (9th Cir.

1989) (noting district court applied 9 U.S.C. § 3 to action stayed pending

arbitration in Korea); see also Scherk v. Alberto-Culver Co., 417 U.S. 506, 511

n.5 (1974) (holding that 9 U.S.C. § 3 applies to arbitration agreements involving

maritime transactions or interstate or foreign commerce).

CCS has now withdrawn its motion to compel Pyrolance to arbitrate its

claims against CCS in Sweden.  Nevertheless, CCS still requests that the Court

exercise its discretion to stay this litigation pending CCS's arbitration

---

[3]Section 3 provides in full that,

[i]f any suit or proceeding be brought in any of the courts of the United
States upon any issue referable to arbitration under an agreement in
writing for such arbitration, the court in which such suit is pending,
upon being satisfied that the issue involved in such suit or proceeding
is referable to arbitration under such an agreement, shall on
application of one of the parties stay the trial of the action until such
arbitration has been had in accordance with the terms of the
agreement, providing the applicant for the stay is not in default in
proceeding with such arbitration.

9 U.S.C. § 3.

proceedings with ACAB, which are ongoing in Sweden. See Coors Brewing Co. v. Molson Breweries, 51 F.3d 1511, 1518 (10th Cir. 1995); Summit Contractors, Inc. v. Legacy Corner, L.L.C., 147 Fed. App'x 798, 802 (10th Cir. Sept. 12, 2005) (unpublished); see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 20 n.23 (1983) (noting that, "[i]n some cases, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of discretion to control its docket."); In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 293 n.12 (4th Cir. 2007); Klay v. All Defendants, 389 F.3d 1191, 1204 (11th Cir. 2004); Summer Rain v. Donning Co./Publishers, Inc., 964 F.2d 1455, 1461 (4th Cir. 1992). Regardless of whether the FAA mandates a stay in this case or whether the matter is otherwise left to this Court's discretion, the Court concludes a stay of these proceedings is warranted. Therefore, the Court grants CCS's motion to stay these proceedings in their entirety, including discovery, pending resolution of the Swedish arbitration proceedings between CCS and ACAB.

The issues that the pending arbitration between CCS and ACAB may address will aid this Court in resolving the claims Pyrolance asserts here. In the Swedish arbitration, for instance, CCS has requested, among other things, that the arbitration panel declare that CCS justifiably terminated the CCS/ACAB Licensing Agreement, and determine that ACAB and Pyrolance have no further right to act under the Licensing and Sublicensing Agreements. Those issues are closely related to the claims Pyrolance is pursuing against CCS in this

litigation.

Furthermore, Pyrolance's rights under its Sublicense Agreement with ACAB stem directly from the CCS/ACAB Licensing Agreement at issue in the Swedish arbitration. In fact, Pyrolance's Sublicensing Agreement states that one of its purposes is

> to obtain from ACAB any and all rights and obligations to the technology and technical assistance as well as copyright, trademark and patent licenses for the purpose of manufacturing, producing and selling such system as the exclusive licensee within the agreed territory, <u>which ACAB may have in relation to the Licensing Agreement</u>, through a sub license from ACAB on terms herein defined.

(Sublic. agreement at 2 (emphasis added).)

Further, the parties to the Licensing Agreement, CCS and ACAB, have expressly agreed that a Swedish arbitration panel will resolve "[a]ny dispute, controversy or claim arising out of or in connection with" that licensing agreement. (Lic. agreement § 19.) Courts in the United States have long recognized the importance of including such arbitration clauses in contracts involving international commerce. Such an arbitration clause, which is a type of forum-selection provision, along with a clause indicating what nation's law applies, eliminates any uncertainty between the parties concerning the law to be applied to resolve any disputes resulting from the agreement. See <u>Scherk</u>, 417 U.S. at 515-16, 519.

> Such uncertainty will almost inevitably exist with respect to any contract touching two or more countries, each with its own substantive laws and conflict-of-laws rules. A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any

international business transaction. Furthermore, such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved.

Id. at 516; see also M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 8-9, 12-15 (1972) (recognizing the importance of a forum-selection clause in contracts involving international business); Yavuz v. 61 MM, Ltd., 465 F.3d 418, 428-30 (10th Cir. 2006) (relying on Scherk and Bremen).

Nor can Pyrolance complain that it is unfairly surprised by a stay awaiting the Swedish arbitrators' determination. Both the CCS/ACAB Licensing Agreement and Pyrolance's own Sublicensing Agreement with ACAB provide that "[a]ny dispute, controversy or claim arising out of or in connection with" the agreements will be subject to arbitration in Sweden. (Lic., Sublic. agreement § 19.) And the Sublicensing Agreement derives its substance from the CCS/ACAB Licensing Agreement. These factors all counsel against going forward with this litigation while the CCS/ACAB arbitration is proceeding in Sweden.

Moreover, the Swedish arbitration proceedings may cast some additional light on the relevant Swedish legal principles, which govern both the Licensing and Sublicensing Agreements. While it is possible that, because Pyrolance is not a party to that arbitration, it may not be bound by the arbitrators' decision,[4]

---

[4]Generally, an entity that is not a party to an arbitration proceeding will not be bound by that determination. See Am. Home Assurance Co. v. Vecco Concrete Constr. Co., 629 F.2d 961, 964 (4th Cir. 1980). But an arbitration award regarding a patent infringement claim, for example, may bind not only a

(continued...)

see Am. Home Assurance Co. v. Vecco Concrete Constr. Co., 629 F.2d 961,

964 (4th Cir. 1980); see also 35 U.S.C. § 294(c) (providing that arbitration award

resolving patent infringement claims "shall be final and binding between the

parties to the arbitration but shall have no force or effect on any other person"),

the Swedish arbitration decision will at the least inform or aid this court's

consideration of the claims Pyrolance asserts in this litigation against CCS. See

Volkswagen of Am., Inc. v. Sud's of Peoria, Inc., 474 F.3d 966, 972 (7th Cir.

2007) (noting that, "[i]n many instances, . . . district courts actually may prefer to

stay the balance of the case in the hope that the arbitration might help resolve,

or at least shed some light on, the issues remaining in federal court"); see also

id. (noting that a district court might abuse its discretion if the court did not stay

litigation, where there was a risk of "'inconsistent rulings' because the pending

arbitration is likely to resolve issues material to the lawsuit") (quotation,

alteration omitted); Am. Home Assurance Co., 629 F.2d at 961, 964 (upholding

---

[4](...continued)
party to that arbitration proceeding, but also those in privity with an arbitrating party. See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 149 F. Supp. 2d 610, 613 (S.D. Ind. 2001).

In this case, there have been suggestions that ACAB and Pyrolance are very closely related entities. For example, Spencer's April 2006 business plan, which was a first draft, indicated that the U.S. company, Pyrolance, would be "a wholly owned subsidiary of the Swedish company, ACAB, and that "[t]he ownership structure of both companies would be identical." (Ex. D-4.) And, in its request for arbitration, CCS indicates that ACAB and Pyrolance "have substantially identical ownership structures." (Ex. D-51.) Similarly, in its supplemental brief, CCS again asserts that the ownership of ACAB and Pyrolance is virtually identical. At this point in the litigation, however, the parties have not presented any evidence specifically addressing the relationship between ACAB and Pyrolance.

district court's decision to stay all litigation pending arbitration between two of several parties involved in litigation where, although "arbitrator's findings will not be binding as to those not parties to the arbitration, considerations of judicial economy and avoidance of confusion and possible inconsistent results nonetheless militate in favor of staying the entire action").

For all of these reasons, the Court GRANTS CCS's motion to stay all of the proceedings before this Court, including discovery matters, pending a final determination in the Swedish arbitration proceedings involving CCS and ACAB. Both parties are ORDERED promptly to advise the Court of all substantive rulings in the Swedish arbitration proceeding, including decisions on appeal, and in any event to give the Court a status report every six months, on January and July 1.

**B.    Pyrolance's motion to stay arbitration in Sweden involving CCS and ACAB**

Pyrolance, in turn, seeks to stay the arbitration proceedings occurring in Sweden between CCS and ACAB.  In essence, what Pyrolance wants this Court to do is to enjoin arbitration proceedings occurring in Sweden between one party before this Court, CCS, and another party which is not before this Court, ACAB. Pyrolance, however, fails to assert any law that convinces the Court that it has authority to do so.  See Kansas v. United States, 249 F.3d 1213, 1221, 1227 (10th Cir. 2001) (considering whether district court had jurisdiction to issue preliminary injunction); see also N. Natural Gas Co. v. Trans Pac. Oil Corp., 529 F.3d 1248, 1250 (10th Cir. 2008) (determining whether district court had subject

matter jurisdiction to enjoin administrative proceeding).

Pyrolance relies, instead, on case law stating the less surprising general proposition that a district court has authority to stay arbitration proceedings, despite the FAA's silence on the question.  See Tai Ping Ins. Co. v. M/V Warschau, 731 F.2d 1141, 1143-46 (5th Cir. 1984) (but concluding district court abused its discretion in staying arbitration in that case); Westmoreland Capital Corp. v. Findlay, 916 F. Supp. 242, 247 (W.D.N.Y. 1996) (in dicta, citing cases), aff'd, 100 F.3d 263 (2d Cir. 1996); L.F. Rothschild & Co. v. Katz, 702 F. Supp. 464, 467-68 (S.D.N.Y. 1988); see also Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 15B Federal Practice and Procedure 3914.17 (2d ed. 1991) (noting that "[t]he relationship between litigation and arbitration may be regulated by orders that grant or deny a 'stay' of the arbitration rather than a stay of judicial proceedings").  Pyrolance's case law, however, does not suggest that this Court can exercise that authority to stay proceedings occurring outside the United States, particularly where one of the arbitrating entities, ACAB, is not a party to the litigation currently pending before this Court.

In Rothschild, for example, a case on which Pyrolance relies, the Western District of New York questioned whether or not it had jurisdiction to stay arbitration proceeding occurring in Chicago.  See 702 F. Supp. at 468 (holding that it could, instead, enjoin the parties before it not to arbitrate in Chicago). And while the Second Circuit, in Tai Ping Insurance Co., reviewed the district court's order staying arbitration proceedings in London, those arbitration proceedings were between two entities which were parties to the litigation

pending before that district court.  See 731 F.2d at 1142-43; see also Rothschild, 702 F. Supp. at 468 (choosing to enjoin parties before the court not to arbitrate in another circuit in the United States, rather than to order the arbitration in the other circuit stayed); cf. Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 648-49, 652 (2d Cir. 2004) (noting, in enforcing arbitration agreement by enjoining a party from suing the other party in a foreign court, that "a federal court may enjoin a party before it from pursuing litigation in a foreign forum;" but requiring, among other things, that "the parties are the same in both matters") (emphasis added).

Even if this Court did have the authority to stay arbitration proceedings occurring in Sweden between CCS and ACAB (which it does not have), for the same reasons discussed above, this Court would not exercise its discretion here to stay those proceedings.  See N. Donald & Co. v. Am. United Energy Corp., 746 F.2d 666, 667, 671 (10th Cir. 1984) (reviewing for an abuse of discretion district court's decision to stay arbitration between several parties involved in pending federal litigation).  The Licensing Agreement underlying Pyrolance's claims asserted here against CCS is an agreement between CCS and ACAB in which the parties expressly provided that they would resolve their differences through arbitration in Sweden.  Pyrolance has failed to persuade the Court to exercise its discretion to interfere with those arbitration proceedings.

## C.  Motions for preliminary injunction

Both Pyrolance and CCS have moved for a preliminary injunction pursuant to Fed. R. Civ. P. 65.  "A preliminary injunction is an extraordinary remedy; it is

the exception rather than the rule." Gen. Motors Corp. v. Urban Gorilla, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007). Therefore, "the right to [such] relief must be clear and unequivocal." Nova Health Sys. v. Edmondson, 460 F.3d 1295, 1298 (10th Cir. 2006) (quotation, alterations omitted).

Usually, a preliminary injunction "is intended merely to preserve the relative positions of the parties until a trial on the merits can be held." Summum v. Pleasant Grove City, 483 F.3d 1044, 1048 (10th Cir. 2007) (quotation omitted), cert. granted, 128 S. Ct. 1237 (2008). The relative positions of the parties—the status quo—is "the 'last peaceable uncontested status existing between the parties before the dispute developed.'" Id. at 1049 (quoting Schrier v. Univ. of Colo., 427 F.3d 1253, 1260 (10th Cir. 2005)). The status quo, then, is not necessarily the positions that the parties occupied at the time litigation began. See Schrier, 427 F.3d at 1257-58, 1260; Doubleclick Inc. v. Paikin, 402 F. Supp.2d 1251, 1255-56 (D. Colo. 2005). Defined in this way, the "last peaceable uncontested status" in this case was when the License and Sublicense Agreements were in effect and Pyrolance had not made any efforts to market and sell the Cobra or the Pyrolance® outside the United States or Canada. It was Pyrolance's international sales efforts that sparked the dispute at issue here. Further, although Pyrolance readily acknowledged its Qatar sale to CCS, the evidence suggests Pyrolance was not as forthcoming about its other international sales efforts. And a party cannot "establish the status quo through secretive or clandestine activity." Doubleclick, 402 F. Supp.2d at 1256.

To obtain a preliminary injunction,

-18-

the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.

Wilderness Workshop v. U.S. Bur. of Land Mgmt., 531 F.3d 1220, 1224 (10th Cir. 2008) (quotation omitted); see also Urban Gorilla, 500 F.3d at 1226.

### 1. Pyrolance's motion for preliminary injunction

Pyrolance asks this court to enjoin CCS from (1) marketing and selling the Cobra in the United States and Canada, contrary to the terms of the licensing agreement; (2) transferring its "non-public technical data" (i.e. know-how) to another party, and giving that party an exclusive license to conduct activities in the U.S. and Canada; and (3) interfering with FPP's performance of its manufacturing contract with Pyrolance, including demands for suspension of performance, solicitation of confidential information from FPP, and solicitation to FPP that it abandon its contractual relationship with Pyrolance.  (Doc. 9.)

### a. Balance of harms

The Court will here consider whether Pyrolance has established irreparable injury, whether the requested preliminary injunction would injure CCS, and the balance of harms, including harms to society, if a preliminary injunction is issued.

"[A] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1260 (10th Cir. 2004) (quotation, alteration omitted).  "Irreparable harm, as the name suggests, is harm that

cannot be undone, such as by an award of compensatory damages or otherwise." Salt Lake Tribune Publ'g Co. v. AT&T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003).

> To constitute irreparable harm, an injury must be certain, great, actual and not theoretical. Merely serious or substantial harm is not irreparable harm. The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.

Schrier, 427 F.3d at 1267 (quotations, citations, alterations omitted).

Pyrolance asserts three ways in which CCS, if not enjoined, will inflict irreparable harm against Pyrolance.

### i.   CCS's marketing and selling the Cobra in the United States and Canada

First, Pyrolance asserts that it will be irreparably harmed if CCS markets and sells the Cobra in the United States and Canada, contrary to the exclusive license CCS granted ACAB. Pyrolance, however, has failed to establish that CCS currently intends to market or sell the Cobra in the United States or Canada. Cf. Heatron, Inc. v. Shackelford, 898 F. Supp. 1491, 1495-98, 1502 (D. Kan. 1995) (holding plaintiff suing former employee to enforce confidentiality agreement had established irreparable harm where defendant admitted that he had already had discussions with his new employer regarding plaintiff's customers, vendors and confidential manufacturing processes). And to be entitled to injunctive relief, Pyrolance must establish that its injury is reasonably certain, see Dominion Video Satellite, 356 F.3d at 1262, or imminent, see Heideman, 348 F.3d at 1189, rather than speculative, Charles Alan Wright,

Arthur R. Miller, & Mary Kay Kane, 11A <u>Federal Practice and Procedure</u> §
2948.1 (2d ed. 1995).

CCS had several customers in the United States before CCS granted
ACAB—and through ACAB, Pyrolance—an exclusive license to act in this
territory.  But since receiving the exclusive license, Pyrolance points to only one
$500 sale of spare parts CCS made in the United States.[5]  Proof of that single,
de minimis sale is insufficient to establish imminent irreparable harm to
Pyrolance.

Even if CCS did sell its Cobra in the United States and Canada, however,
Pyrolance has failed to establish that it will be irreparably harmed as a result.
Although it is "generally accepted . . . that breach of an exclusivity clause almost
always warrants the award of injunctive relief," injunctive relief in such cases is
not automatic.  <u>See</u> <u>Dominion Video Satellite</u>, 356 F.3d at 1262 (citing cases).
To determine whether injunctive relief is warranted where there is a possible
breach of an exclusivity clause, the court must consider "such factors as the
difficulty in calculating damages, the loss of a unique product, and existence of
intangible harms such as loss of goodwill or competitive market position."  <u>Id.</u> at
1264.  In this case, if Pyrolance prevails, CCS can remedy any harm to
Pyrolance from CCS's sales activities in the United States and Canada by
paying Pyrolance the amount Pyrolance would have made on such a sale.  Any

---

[5]In March 2007, CCS also referred a potential client in Queensbury, New
York, to Pyrolance.  However, Pyrolance specifically complained, not that CCS
took this opportunity from Pyrolance, but only that CCS prepared the offer for
this customer, instead of letting Pyrolance do that.

"loss of business can be compensated in money damages.  Economic loss usually does not, in and of itself, constitute irreparable harm."  <u>Port City Props. v. Union Pac. R.R. Co.</u>, 518 F.3d 1186, 1190 (10th Cir. 2008) (quotations omitted).  Pyrolance has failed to establish that damages relief would not be sufficient here.  <u>See</u> <u>id.</u> at 1264-65 (upholding denial of injunctive relief where district court "refused to accept that Dominion's very existence was threatened, that it was losing customers or its competitive position in the marketplace, that it was close to business failure, or that it had suffered harm to its goodwill").

In some cases, "when the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted, even though the amount of direct financial harm is readily ascertainable."  Wright, Miller & Kane, 11A <u>Federal Practice & Procedure</u> § 2948.1.  But here Pyrolance has never asserted, let alone presented any evidence suggesting, that the potential harm resulting from CCS selling the Cobra in the United States and Canada imminently threatens the existence of Pyrolance's business.

Pyrolance does argue that its reputation will be irreparably harmed if CCS sells the Cobra in the United States and Canada because the Cobra is a defective product.  Pyrolance's theory is that the Cobra is sufficiently similar to the Pyrolance® such that the defective nature of the Cobra will negatively impact Pyrolance's ability to market and sell the Pyrolance®.  But the evidence the parties have presented thus far indicates that CCS has sold over 300 Cobras throughout the world.  Pyrolance has not asserted any evidence

suggesting that a significant portion of those 300 units has been so defective that selling the Cobras in the United States and Canada would detrimentally effect sales of the Pyrolance®.  In any event, the fact that Pyrolance sells its modified device under a different name would lessen any possible taint that could result from defects in the Cobra.  For these reasons, Pyrolance has failed to establish that the possibility that CCS might sell the Cobra in the United States and Canada presents imminent and irreparable harm to Pyrolance.

### ii.    CCS's transferring its know-how to another entity

Next, Pyrolance argues that it will be irreparably harmed if CCS transfers its know-how and U.S. patent to another licensee, permitting that new licensee to act exclusively in the United States and Canada, in Pyrolance's stead.  It is possible that, if CCS transfers its know-how to another party, CCS may be unable to unring that bell, should Pyrolance ultimately prevail in this case. However, that risk is diminished by Pyrolance's insistence that its Pyrolance® utilizes new technology developed confidentially by it at FPP.  Further, if it were necessary and legally sustainable to try to "unring the bell," the Court is optimistic that it has tools at its disposal that might be sufficient for the task.  In any event, Pyrolance has presented no evidence that it is imminent that CCS will enter into an exclusive licensing relationship in the United States and Canada with any other party.

### iii.    CCS's interference with FPP

Lastly, Pyrolance asserts that CCS will be irreparably harmed if this Court does not enjoin CCS from contacting FPP, from interfering with FPP's

performance of its manufacturing contract with Pyrolance, and from CCS trying to get FPP to enter into a manufacturing agreement instead with CCS. Pyrolance further fears that CCS will attempt to obtain from FPP the confidential information regarding FPP's modifications and improvements to the Cobra.

In support of this argument, Pyrolance submits evidence that, after CCS terminated its Licensing Agreement, CCS notified FPP that ACAB, and thus Pyrolance, no longer had a license to use CCS's U.S. patent. That conduct does not appear to be wrongful interference, but instead was an apparent good faith notice to FPP, based upon CCS's terminating the Licensing Agreement. Cf. Dominant Semiconductors, 524 F.3d at 1256-59, 1260-61 (affirming summary judgment for defendant, holding that "[f]ederal patent law . . . preempts state-law tort liability when a patentee in good faith communicates allegations of infringement of its patent;" further holding that patentee does not act in bad faith if the information communicated is "objectively accurate").

Pyrolance also complains that in the same notice CCS sent FPP, CCS also solicited FPP to consider entering into a manufacturing agreement with CCS instead of Pyrolance. But in this case, FPP apparently did not accept CCS's offer, and Pyrolance has not pointed to any other contact between CCS and FPP since that time. Therefore, Pyrolance has again failed to establish that it faces imminent and irreparable harm from CCS's possible future conduct.

For the foregoing reasons, Pyrolance has failed to establish that, without the injunctive relief it seeks, Pyrolance will not be able to resume its activities or

return to the status quo in the event it prevails in this litigation.  See Heideman,
348 F.3d at 1189.

    The Court now considers any possible harm that CCS might suffer, should
this Court grant Pyrolance's motion for injunctive relief.  CCS, however, has
similarly failed to establish that it would be imminently harmed should the Court
grant Pyrolance the injunctive relief it seeks.  That is primarily true because
CCS has not shown that it intends to enter the United States and Canada
markets.

    Finally, the Court considers the public interest.  Here, however, the public
interest does not weigh heavily for one side or the other.  See Wilderness
Workshop, 531 F.3d at 1231 (upholding district court's conclusion in that case
that the public interest did not weigh heavily in favor of either party); Salt Lake
Tribune, 320 F.3d at 1106 (noting public interest was not a consideration in that
litigation between two contracting businesses).  To the extent the preliminary
injunction decision in this case does implicate the public interest, that interest is
served by not entering injunctive relief.  Firefighting agencies in the U.S. and
Canada will have access to the Cobra, and will perhaps benefit from increased
competition.  And there is a public interest in granting a preliminary injunctive
only in compelling cases.

    For the foregoing reasons, the balance of harms counsels against
granting Pyrolance's motion for preliminary injunctive relief.

### b.    Likelihood of success on the merits of the case

    Pyrolance's request for injunctive relief is, in essence, an attempt to

assert its contractual rights under the Sublicensing Agreement against CCS regardless of how it may chose to characterize its claim. Those rights obviously flow from, and are derivative of, the CCS/ACAB Licensing Agreement, which CCS has terminated. In its briefing and at the hearing on the preliminary injunction, Pyrolance's attention was on attempting to undermine CCS's defenses to Pyrolance's claims, instead of where it should have been appropriately focused in the first place – explaining its basis for recovery on its claims.[6] Pyrolance does not explain how it can enforce its rights under the Sublicensing Agreement, which has been effectively terminated, against CCS; and Pyrolance expressly does not argue that it is a third-party beneficiary to the CCS/ACAB Licensing Agreement such that it can attempt to enforce the terms of that agreement against CCS.[7]

While Pyrolance has failed to explain on what basis it is attempting to enforce its rights under the Sublicensing Agreement against CCS, it is clear that the merits of Pyrolance's claims related to its request for injunctive relief are inextricably tied to the validity of CCS's termination of the CCS/ACAB Licensing

_____

[6] Remarkably, in Pyrolance's motion for preliminary injunction, Pyrolance did <u>not</u> attempt to demonstrate why it was likely to prevail on its claims but, instead, Pyrolance's only argument was that CCS would be unable to establish a defense to these claims. It was obviously premature for Pyrolance to attempt to strike down a defense by CCS when it had failed to even assert how it could make out a claim against CCS.

[7] Pyrolance is no longer asserting a contract claim under the Licensing Agreement in its amended complaint. It had brought such a claim as a third-party beneficiary in the original complaint, but Pyrolance appears to have removed that claim from its amended complaint as a tactical choice to avoid mandatory arbitration of its claims in Sweden.

Agreement.  This Court is staying its proceedings pending the Swedish arbitrator's decision because that decision will likely inform or aid this Court's consideration of the claims Pyrolance asserts in this litigation against CCS. Therefore, it would be improvident for this Court to address at this stage of the proceedings whether CCS validly terminated the Licensing Agreement.  But at this stage of the proceedings Pyrolance has failed to carry its burden of showing a substantial likelihood of success on the merits.

Finally, in as much as Pyrolance's motion for preliminary injunction is related to its claim for intentional interference with its contract with FPP, Pyrolance has failed to establish that there is a substantial likelihood it will prevail on the merits of its claim.  Pyrolance has not asserted which jurisdiction's law applies to this claim, let alone what the elements of the claim are or how the evidence presented thus far satisfies those elements. Furthermore, Pyrolance has not asserted why this Court should enjoin CCS from enforcing its patent rights against a third-party.  Cf. Dominant Semiconductors, 524 F.3d 1254, 1260 (Fed. Cir. 2008) ("Federal patent law . . . preempts state-law tort liability when a patentee in good faith communicates allegations of infringement of its patent.").

### c.    Conclusion

"[A] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  Dominion Video Satellite, 356 F.3d at 1260.  Primarily because Pyrolance has failed to establish that, without preliminary injunctive relief, it faces irreparable harm, the Court DENIES

Pyrolance's motion for a preliminary injunction.

## 2.    CCS's motion for preliminary injunction

CCS requests that this Court enjoin Pyrolance from marketing and selling the Cobra anywhere outside the U.S. and Canada.  (Doc. 16.)

### a.    Balance of harm

Again, under this section the Court considers whether CCS has established irreparable injury, whether Pyrolance would be injured by the requested preliminary injunction, and the balance of harms, including harm to society, if the preliminary injunction is granted.

To determine whether injunctive relief is warranted where there is an allegation that one party is breaching an exclusivity provision, the Court must consider "such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position."  Dominion Video Satellite, 356 F.3d at 1264.  In this case, CCS contends that, without a preliminary injunction, Pyrolance will inflict irreparable harm against CCS in three primary ways.

### i.    Pyrolance's international marketing and sales

First, CCS asserts that Pyrolance will continue to make sales internationally.  In fact, during the evidentiary hearing on August 22, 2008, Kevin Spencer testified that Pyrolance was pursuing a number of sales transactions around the world, including Taiwan, Korea and the Middle East.  Nevertheless, CCS has failed to establish that any harm to CCS resulting from these international sales cannot be readily calculated and remedied with a damages

award.  See Port City Props., 518 F.3d at 1190.

### ii.    Market confusion

CCS further asserts that the fact that Pyrolance is selling its own device,

the Pyrolance®, throughout the world will cause market confusion with CCS's

Cobra.[8]  As proof, CCS cites one instance in which a Pyrolance® malfunctioned

in Latvia, and the potential customer contacted CCS with questions about that

malfunction.  But the evidence presented thus far indicates that the customer

tried to contact Johan Patyranie at CCS in May 2008.  Patyranie had been the

managing director at CCS until February 2008.  Since that time, however,

Patyranie has worked for Pyrolance.  So the potential customer's confusion in

trying to contact Patyranie at CCS about the malfunction may have been as

much confusion as to where Patyranie was employed as it was an inability to

distinguish between the Pyrolance® and CCS's Cobra.

In any event, because the two devices are marketed under different

names, market confusion would be limited.  Moreover, beyond this one incident

in which a potential customer complained to CCS about a Pyrolance®, CCS has

not presented any evidence suggesting there will be market confusion between

the two products.

### iii.    Harm to CCS's network of exclusive distributors

---

[8]CCS appears to argue that its does not want the Cobra to be confused
with the Pyrolance®, because CCS deems the Pyrolance® to be defective.  The
Court concludes that the evidence fails to establish that either the Cobra or the
Pyrolance® is so defective that one will unfairly taint the other.  Nor is there
evidence that these two devices are so similar, despite the different trade
names, that market confusion is imminent.

CCS also contends that Pyrolance will irreparably harm the worldwide network of exclusive distributors CCS has built.  In support of this assertion, CCS presented evidence that it takes a substantial amount of time and resources for its distributors to build a customer base.  But CCS has failed to show that it has lost any distributors, or that it has been unable to establish other distributorship relationships, or that such losses, if they occur, could not be remedied by damages.

Turning again to the possible harm to Pyrolance, if this Court enjoined it from selling internationally, Pyrolance has not established that it faces imminent harm from such an injunction.  Nor does the public interest weigh heavily on either side.  Nonetheless, CCS, the party seeking this preliminary injunctive relief, has not established, clearly and unequivocally, that it is entitled to such relief to prevent irreparable harm.  See Nova Health Sys., 460 F.3d at 1298.

### b.    Likelihood of success on the merits of the case

As best as we can construe CCS's claim, it is that CCS has a contractual right to prohibit Pyrolance from engaging in marketing and sales efforts outside the U.S. and Canada.  CCS has failed to demonstrate that it is likely to prevail on such a claim for two reasons.  First, CCS has not asserted any basis on which an alleged contractual limitation in the CCS/ACAB Licensing Agreement should bind Pyrolance; nor has CCS alleged any basis on which it can assert an alleged contractual limitation on Pyrolance's activities in the ACAB/Pyrolance Sublicensing Agreement.  Secondly, even if it is possible for CCS to enforce one of those agreements against Pyrolance, as Pyrolance notes, CCS has now

terminated the Licensing Agreement, and CCS has not asserted that any prohibitions exist after the termination of the Licensing Agreement related to the marketing or selling a Cobra-type device outside the U.S. and Canada in countries not covered by CCS's patents. (See Doc. 61 at 19) ("To show likelihood of success on the merits, CCS must prove that *post-termination* Pyrolance is infringing CCS's patent and know-how rights in countries that would be included in any preliminary injunction.")

### c.    Conclusion

CCS has not established a substantial likelihood that it will prevail on the merits of its claim.  Nor has CCS established that the balance of harms tips in favoring of granting CCS the preliminary injunctive relief it seeks.  Therefore, the Court DENIES CCS's motion for a preliminary injunction.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS CCS's motion to stay these proceedings in all respects, including discovery, pending the outcome of the Swedish arbitration, DENIES Pyrolance's motion to stay the Swedish arbitration proceedings between CCS and ACAB, and DENIES both parties' request for injunctive relief.  While these proceedings are stayed, both parties are ORDERED promptly to advise the Court of all substantive rulings in the Swedish arbitration proceeding, including decisions on appeal, and in any event to give the Court a status report every six months, on January and July 1.

DATED AND SIGNED this  11th  day of   December   , 2008.

BY THE COURT:

*s/ David M. Ebel*

_____
David M. Ebel
U. S. Circuit Court Judge